The first case on our agenda today for the January term is agenda number 1, number 129965, People of the State of Illinois v. Tyson Thomas. Counsel for the appellant, are you prepared to proceed? Good morning, your honors. Good morning, counsel. I may please the court. My name is Eric Castaneda, and I'm with the Office of the State Appellate Defender on behalf of Mr. Tyson Thompson. Your honors, feel free to anticipate my name as Castaneda or Castaneda. Your honors, we are here today to ask this court to apply the two-step Second Amendment historical analysis announced by the United States Supreme Court in Bruin to subsection 81385 of the aggravated unlawful possession of a weapon statute and find that it is facially unconstitutional. The first step of the Bruin test requires courts to first determine whether the conduct being regulated falls under the protection of the Second Amendment. If the conduct does trigger the Second Amendment, then the second step of the test places the burden with the state to point to a historical analog, a well-established historical analog, that is comparatively justified or relevantly similar. Here, Mr. Thompson was convicted under a statute that completely prohibits the public open carry of a firearm in Illinois and that punishes the failure to undergo a double licensing regime under the CCL Act. Neither of these parts of the statute can survive the Bruin test, and your honors should find it unconstitutional and reverse Mr. Thompson's conviction for aggravated unlawful possession of a weapon. Why does open carry violate the Bruin test? Because historically, what the founders, when they enacted the Second Amendment, they envisioned a right that protected open carry and not concealed carry. And we can look to a lot of the cases that have been cited by both, by Mr. Thompson and by the state, to show that the founders really meant open carry. For example, and really starting with the U.S. Supreme Court in Robertson v. Baldwin in 1897, the court expressly stated that the right of the people to keep and bear arms under Article II is not infringed by laws prohibiting the carry of concealed weapons. Recently, the Tenth Circuit in 2013 in Peterson v. Martinez, the Ninth Circuit in 2016 in Peruto v. County of San Diego, both courts stated that the Second Amendment does not protect the concealed carry of firearms. And the state doesn't address these cases. Counsel, can you kind of help me lay the groundwork? I want to make sure I understand exactly where we are. So is this case about concealed carry, open carry, both? Where are we on that? So our challenge is specifically to open carry, the categorical ban on open carry. Our position is not that you can't regulate open carry, but that there can't be a categorical ban on it. We think that concealed carry and open carry are two categorically different conducts, one which is protected under the Second Amendment and the other which is not. So the government can regulate concealed carry as it pleases, but the same doesn't apply for open carry. And the facts of this case are not open carry, Mr. Thompson's case. Yes, there was open carry here and there was concealed carry, so there's actually both. So below, we actually brought a sufficiency of the evidence argument, and we argued that the facts should have been confined to the firearm being in the glove compartment. But the state argued that, no, it was actual possession, that at some point he possessed that weapon in the vehicle, so at some point it was open carried because his prints were on it, his DNA was on it. And so the state can't have it both ways where it argues below that it was actual possession and that it was either open carry or concealed carry, and then an appeal tried to confine it to only concealed carry. There was an issue there about the original charges were about a drive-by shooting. And there on the issues about the use of the weapon, the jury was hung, and eventually those charges were dismissed, and all that was left was the charge related to the gun in the glove compartment, right? Correct. And that's what I argued below, Your Honors, and I thought that's what the facts should have been confined to, but that was simply not the case. That's not what the court found. That's not what the state argued. The state argued that at some point he possessed that weapon in the vehicle, and Ballard tells us that possessing a handgun in the vehicle, I believe that's the First District case, is open carry. So we do have open carry here. And it's really not a factual distinction that Your Honors have to engage in. All Your Honors really have to engage in is whether he was convicted under a statute that prohibits open carry, and that's what Aguilar tells us. That's what Your Honors tell us in Aguilar, that as long as you are convicted under the statute, then you have a right to challenge the constitutionality of that statute. And also in Nunn v. State in 1846, the Georgia Supreme Court analyzed an 1837 Georgia statute that prohibited the wearing and carrying of firearms in public. However, that statute did not distinguish between concealed carry and open carry, and the Georgia Supreme Court specifically struck down the portion of the statute that prohibited open carry. And the court was specific in its language when it stated, but that so much of it as contains a prohibition against bearing arms openly is in conflict with the constitution in void. And then the United States Supreme Court in Heller and Bruin endorsed this holding and stated that the Georgia Supreme Court perfectly captured the natural right of self-defense guaranteed under the Second Amendment. Counsel, what in Bruin suggested that open carry is required under the Second Amendment? It sounds like you're arguing that the Second Amendment has to spell out open carry for it to be constitutional, and I don't think that's what the court said. No, the court in Bruin did not address open carry. It was only addressing the proper cause requirement of the New York statute. But the court in Bruin did have specific language where it stated, you know, in reviewing the Georgia Supreme Court that I was just discussing, the court specifically stated that states could lawfully eliminate one kind of public carry, concealed carry specifically, so long as they left open the option to carry openly. Now, the Bruin Supreme Court didn't specifically address open carry there, but it did, again, endorse the holding by the Georgia Supreme Court in Nunn v. State. Now, the state proposes a more general interpretation of history that states could regulate one form of public carry so long as the other form of public carry was left available. But in order to do that, your honors would have to find that the Georgia Supreme Court simply flipped a coin and decided that the statute could regulate concealed carry, not open carry. And that would essentially be a violation of separation of powers because that would be the court enacting a new statute on its own based on its own policy determinations. If the tradition were truly, as the state proposes, that the government could traditionally leave one form of public open carry or public carry open and regulate the other, then the Georgia Supreme Court would have remanded that statute for the legislature to make that determination. They would not have made that determination on their own. And the reason is because they were simply interpreting the Second Amendment. Why is that not – I mean, it doesn't have to be a dead ringer for the cases in the past and the tradition. Why is this not comparably analogous even though – I understand the difference between concealed and open carry. But, again, Gordon Bruin said, you know, you don't have to have a perfect match or have a dead ringer. Why is this – you know, the statute in this case violating the Second Amendment according to you? And, yeah, Your Honor, we don't have to have a dead ringer. And here I think the dead ringer is that all the statutes and cases cited by Mr. Thompson and by the state all show that it's a dead ringer that the Second Amendment only protects open carry. And the reason that is is, again, we can look – every state to have addressed the issue of public carry came down one way. They interpreted the Second Amendment as allowing for open carry. And the language from these cases is compelling. And I'll point to a few here. The Alabama Supreme Court in 1840 in State v. Reed stated that the legislature cannot inhibit the citizens from bearing arms openly because the Constitution authorizes him to bear them for purposes of defending himself and the state. And it has only been carried openly that they can be efficiently used for defense. And so that's a dead ringer that they understood that the Second Amendment only protected open carry. So I'm real – really, really confused. I thought this case was about the licensing aspect, concealed carry licensing. So you're saying that's not the issue in this case? We have two issues. It is the issue, Your Honor. Our first challenge is to the categorical ban of open carry that the unlawful possession of a weapons statute imposes and also its criminal enforcement of a double licensing regime under its subsection 385 where it incorporates the CCL Act. So we bring – we're bringing two challenges. One, the categorical ban on open carry. Two, and its double licensing regime. So, yes, there are two challenges, Your Honor. So, counsel, what about the fact that Illinois is described as having a shall issue regime? How does that impact our analysis? And does that impact whether or not we even get to the second step of Bruin? No. So that came from a footnote under footnote 9 of the Bruin decision. But the Seventh Circuit in Atkinson stated that we can't rely on the footnote 9 from the Bruin decision to address these statutes when being challenged. The Seventh Circuit in Atkinson specifically stated that courts must still engage in a historical analysis. And the first step, is the conduct regulated? Does it fall under the protection of the Second Amendment? Let me ask you about footnote 9, which the appellate court, from my understanding, just relied on footnote 9 and said, this issue about the shall issue regime in Illinois has already been resolved by the Supreme Court in Bruin. Footnote 9, to be clear, nothing in our analysis should be interpreted to suggest unconstitutionality of the 43 states' shall issue licensing regimes. And later on in that footnote, that said, because any permitting scheme can be pushed toward abusive ends, we do not rule out constitutional challenges to shall issue regimes where, for example, lengthy wait times and processing licenses, et cetera, burdens that right. And then, of course, Kavanaugh, in his concurrence, Justice Kavanaugh, goes on and straight up says that, by contrast, 43 states, including Illinois, employing objective shall issue licensing regimes may continue to do so. So why doesn't this section of Bruin itself answer the question here? This statute is constitutional, as the court said in footnote 9 and Kavanaugh's explanation. Yeah. Why don't we stop there? And so, Your Honor, in that same footnote that Your Honor just quoted, in that same language, the court said that we do not rule out challenges to licensing regimes, shall issue licensing regimes. And I'll point out, out of the 43 states that the court stated that were shall issue states, 23 of them, and I believe it was footnote 1, the court pointed out have no licensing schemes whatsoever. They do not, or I should say do not require citizens to first go through a licensing requirement before they possess a handgun in public. So that shows and indicates just the superficial language that the court was using to simply guard against not providing advisory opinions. But the court wasn't making a decision on shall issue licensing regimes. It wasn't opening the hood of the CCL Act and looking at all these parts and determining whether, first, is it really a shall issue licensing regime. And, counsel, that's what I want to ask you. What's your position on that? Do you agree that Illinois is a shall license regime? I think there is a provision there that requires that you follow the orders of the instructors in order to pass the firearms training test. However, it doesn't provide exact guidelines on what those orders are. And so this allows some discretion to those instructors to deny licenses. And it kind of goes to that bureaucratic process that the court in New England was kind of doing away with, with the New York statute. Counsel, did your client apply for a CCL license? No, Your Honor. Well, then how is he burdened by this licensing regime? Because it's still applied to him. He still received a conviction under the aggravated unlawful possession of a weapon statute because under subsection 385, it incorporates the CCL Act. And the State, in its brief, didn't contest whether he had standing to tell the CCL Act. But it's a shall issue provision. If he had applied, the State has directed that it shall issue it to him. But he didn't even try, counsel. You know, Your Honor, recently, and this happened after we submitted our briefs, my reply brief, in December, the United States Supreme Court denied cert in a case, a Hawaii case. And Justice Thomas stated that citizens are not required to undergo licensing regimes that are unconstitutional. And so he wasn't required to go and apply to the CCL Act. But don't you think a condition proceeding to you bringing this challenge would be that he first applied for it and he didn't receive it? And then you could argue he was burdened by this regime. No, Your Honor, not under these circumstances. And this court in Aguilar stated that when someone is convicted under a statute, then they have standing to challenge that statute. We do cite an appellate court case below that found the same thing. And the State conceded in that case that if you are convicted under subsection 385 of the aggravated unlawful possession of a weapon statute, because it incorporates the CCL Act, and my client received an injury from the CCL Act because it's being imposed against him, he received 30 months in prison because he did not have a license. And so it's being imposed against him. Whether he applied for it or not, he's being punished for it. And so he has standing to challenge it. Counsel, don't we have to, in order to find Illinois' statute unconstitutional, find that the dual regulatory system in looking at the CCL Act specifically here unduly hinders someone's right, their Second Amendment rights to keep and bear arms? Don't we have to find it that unduly hinders or is onerous in some fashion? And if so, how is the statutory scheme unduly hindering the rights of your client and other citizens? You know, Your Honor, I think here we can quickly get past the first step of the Bruin analysis and that this statute does implicate the Second Amendment. And under the second step, what the State has to show this court is they have to point you to a historical analog that is well established that shows that citizens traditionally and historically had to go through two licensing regimes before they were allowed to carry their handguns in public. And looking at the statute, what the statute really regulates is the simple carrying of a firearm. It's not the discharge of a firearm. It's not specifically tailored to someone who has been found to be an unlawful citizen. Say, for example, my client, Mr. Thompson, he had his boy card. He was determined to be a lawful citizen who could possess a handgun in public for self-defense. And so the State has to point, Your Honors, that's the test. Is there a historical analog where this nation traditionally required that citizens first underwent two separate licensing regimes before they were allowed to carry their handguns in public? Now, the State does point to surety statutes, going-to-arm laws, and disarmament laws. But these laws are not relevantly similar to the aggravated unlawful possession of a weapon statute. Now, the U.S. Supreme Court has provided us with at least two metrics, and that is we have to look to the why and how the historical analog being proposed burdened the right to bear arms. And if the current law, the modern law being challenged, addresses the same issues and problems that were addressed by the historical analog, then that is a good indicator that it's relevantly similar. However, here, surety statutes are distinguishable in three significant ways. At least three significant ways. One, for instance, with the surety statutes, everyone was presumed to have a right to carry firearms unless it was proven otherwise, right? Unless someone went before a neutral magistrate and made out a specific showing that there was reasonable cause to fear injury or breach the peace by an individual arms bearer. And even then, that accused arms bearer could still carry their handgun in public so long as they posted a bond. Here, it's distinguished the aggravated unlawful possession of a weapon statute because no one can possess a handgun in public unless they first go through this double licensing regime. So that's distinction number one. Second, surety statutes were simply preventative measures. However, the aggravated unlawful possession of a weapon statute imposes a criminal punishment, a conviction of which is a class four felony with a sentencing range of one to three years in prison. A second conviction is a class two felony subject to a sentencing range of three to seven years in prison. And along with that comes a long life stigma of having a conviction, a felony conviction in your record. And for what? For conduct that is protected under the Second Amendment, that is carrying a ready-to-use handgun for self-defense. And the court in Bruin distinguished surety statutes in this exact same way and found that the New York licensing regime there applied to all citizens. It was a broad licensing regime where the surety statute specifically targets those who threaten to do harm. And, Your Honors, you know, the state also points to a history of preventing dangerous and mentally ill individuals. But the Illinois state has a bunch of robust laws in place that specifically target those kinds of regulations. For example, the FOIA Act provides for a mandatory background check system every time a gun is transferred and purchased. And it looks to different databases, state databases, federal databases, including the FBI's National Instant Criminal Backgrounds Check System, mental health records from the Department of Health, to ensure that those who are possessing firearms are law-abiding citizens. The state also has the Armed Ritual Criminal Statute, the Unlawful Possession of a Weapon by Felony Statute, as regulations that are specifically designed to deal with the possession of weapons by those individuals who have been deemed dangerous and otherwise unlawful. And even the FOIA Act itself has a Class III felony conviction against those who possess a firearm, but who have already been determined that they are ineligible to have been issued a FOIA card. That is a statute that's specifically designed to target those individuals who are not supposed to be carrying firearms. And, you know, we're not asking the legislature to enact new statutes or new licensing regimes. We're simply asking them to separate these two statutes, the FOIA Act and the CCL Act, and only require citizens to go through an unlicensing scheme. If you want to keep your firearm at home, you can apply for the FOIA Act. If you want to carry a handgun outside the home for self-defense, you can apply for the CCL Act. And, Your Honors, for these reasons, we ask that you find that subsection A1385 of the Aggravated Unlawful Possession of a Weapon Statute and the CCL Act is spatially unconstitutional under the two-step framework announced in Bruin, and that you reverse Mr. Thompson's conviction. Thank you very much, Counsel. Thank you, Your Honors. Good morning, Your Honors. Counselor, may it please the Court, Assistant Attorney General Garson Fisher of the people. Your Honors, I want to start with the question of standing that was raised earlier. Because the one statute that this defendant has standing to challenge is the provision of aggravated unlawful use of a weapon under which he was convicted. The Court was clear about this in Mosley, for example. And while my friend continues to focus his argument on Illinois' ban on open carriage, the problem is that the relevant provision of AUUW doesn't ban open carriage. Now, to be clear, there are other statutes in Illinois, UUW, penalty provisions of the Concealed Carry Act itself, that do ban open carriage. But what the relevant provision of AUUW says is that you cannot legally carry a firearm in public unless you have a currently valid concealed carry license. It doesn't say anything about open versus concealed carriage. And so while I am, of course, happy to answer whatever questions the Court might have, including about why Illinois' ban on open carriage is also constitutional, I plan with the Court's leave to focus my argument on the issue that is before this Court, which is whether the state can constitutionally criminalize the unlicensed carriage of firearms in public when the licensed carriage of firearms is readily available to all ordinary law-abiding citizens via a shall-issue licensing regime. And the answer to that question is clearly yes. We know the answer to that question is yes because the United States Supreme Court told us so. And as much as my friend would like to sweep that under the rug, the Court said in no uncertain terms that shall-issue licensing regimes, including explicitly Illinois', are constitutional. Counsel, I think opposing counsel basically argues in part of it that the fact that Illinois has this dual system that makes us an outlier and therefore the statute is unconstitutional. I would respond to that in several ways, Your Honor. First, as an initial matter, it's a little bit of a straw man because the only license that's relevant here is the concealed carry license. It so happens that having a FOIA card is a prerequisite to acquiring a concealed carry license, but that requirement does not actually make the concealed carry license requirement an infringement on the right to bear arms. Just to step back a tiny bit to the big picture, the Court wasn't clear about whether it was applying the first textual step of its test or the second history and tradition step of its test when it said that shall-issue licensing regimes are constitutional. I think the best reading is that it was applying the first textual step because shall-issue licensing regimes don't actually infringe on the right to carry firearms and the mere fact that a FOIA card is a prerequisite to subsequently acquiring a concealed carry permit doesn't make Illinois' system an infringement on the right to carry firearms. And the Court was explicit that things like fees and processing time and even explicitly firearm safety training, which is one of the aspects of the CCL Act that is different than the FOIA card Act, are not infringements on the Second Amendment right to carry firearms. So the mere fact that there is a second licensing requirement, so to speak, a prerequisite license to get a CCL doesn't make Illinois' CCL requirement an infringement on the right to bear arms. The second thing is, as the Court has noted, we're not looking for an historical twin. We're not looking for a close cousin, even. The mere fact that 18th century legislatures wouldn't have thought to, and technologically could not have, implemented a modern licensing regime to address similar concerns to what Illinois' 20th and 21st century General Assembly are addressing with the concealed carry permit doesn't mean that those old 18th century legislatures didn't have the constitutional authority to do so any more than modern gun owners are restricted to possessing firearms that were familiar to or technologically available to 18th century gun owners. We're not, as Justice Barrett put it in her Rahimi concurrence, the law is not trapped in amber. Actually, I think it starts with Chief Justice Lauer's majority. He used that expression, and then she picks it up because it's so poetic. I was going to ask you about how you think Rahimi affects the Bruin analysis. So let me just say that we understand that since Bruin courts all over the country, here and everywhere else, are struggling to develop the appropriate approach that the Supreme Court is ordering us to do. We're trying to follow the court, but trying to understand what they want from us. And certainly the various opinions in Rahimi, and there were a number of them, certainly give us different angles of the discussion. Do you think Rahimi has had any impact, whatever the holding is of Rahimi, has it had any impact on how we should handle this issue after Bruin? I think Rahimi and its various opinions added a lot of clarity to how to approach the second history and tradition step of the test, because it really drives home that we're not looking for some law from the past that operated exactly the same way or looked exactly like the modern licensing regime. We're looking at the kinds of problems that were being addressed, which in this case, as well as in a number of the historical regulations that are cited in our briefs, is the risk of firearm violence by groups of people that the legislature has identified as dangerous, and the approach to addressing that problem. And Illinois, just like historically legislatures have, has addressed those problems by saying we are going to presumptively allow all ordinary law-abiding citizens to carry firearms, but we're going to disarm those groups of people who we think are inherently dangerous. And because Illinois' shall-issue licensing regime shares that how and that why with that history and tradition, as we see from looking at the way that the historical analogs are discussed, both in the Rahimi majority, but also in a great amount of detail by both Justice Barrett's concurrence and the other concurrences in Rahimi, we see that that's all we're looking for, that we're really not looking for some sort of historical twin. Rahimi didn't really deal with the first textual step in a lot of detail, although there's some interesting language in the concurrences that sort of explain that the purpose of the historical tradition step is to resolve ambiguity in the scope of the text. We're still engaging in the traditional act of constitutional interpretation. What does the language of the Second Amendment actually mean? And I think, actually, in this case, when you look at it from that perspective, you don't actually even have to get to the second step, because we know what the word infringe means and how it's been understood by the court in relation to these shall-issue licensing regimes. And where a ordinary law-abiding citizen can get a concealed carry permit and then lawfully carry a firearm in public, the requirement that they do so doesn't infringe on their right to bear arms. Now, to be sure, the CCL requirement infringes on the ability of felons and mentally ill and others to bear firearms in public, but the court has told us repeatedly, dozens of times in each of their major Second Amendment cases, that the term the people in the Second Amendment applies to ordinary law-abiding citizens. So I think just looking at the plain text of the Second Amendment, the AUDW statute is constitutional. The defendant's conduct here, the unlicensed carriage of firearms, when the licensed carriage of a firearm is readily available to all ordinary law-abiding citizens, is not covered by the plain text of the Second Amendment. But Rahimi certainly shed some light on how the court would approach the second step of the analysis if it decided to proceed to that step. So ultimately, under your position, it's not an infringement on the Second Amendment. We don't even get to the second step of the Bruin test. I think that is the best way to approach the analysis. However, if the court does proceed to the second step, I think that the how and the why of the history and tradition of firearm regulation discussed in our briefs, things like surety statutes and disarmament laws, are consistent with a shall-issue licensing regime. And again, we know that the U.S. Supreme Court thinks so. And so while that was dicta in Bruin, this court would have to disagree with the court, either on the general issue that shall-issue licensing regimes are constitutional, or find that there's something specific about Illinois' licensing regime that makes it, unlike all of these other shall-issue licensing regimes, unconstitutional. And the main thing that my finding focuses on is the prerequisite that you have a Floyd card act. I mentioned a couple of reasons why I don't think that's a meaningful distinction, but I would also note that the Fourth Circuit upheld the dual licensing regime in Maryland. The U.S. Supreme Court earlier this week denied certiorari in that case. So I don't think there's anything about the prerequisite that you have a Floyd card that makes Illinois' scheme unconstitutional. And, you know, in terms of the actual language of footnote 9, which identifies these sort of as-applied type challenges where things are put to abusive ends to effectively make a licensing regime a bar on public carriage, there, too, there's nothing about Illinois' regime that would make it unconstitutional in that way. And the court would need no further than the hundreds of CCLs issued every month in this state to see that it is not effectively barring ordinary law-abiding citizens from lawfully carrying weapons. And so the gentleman in this case, he had, prior to this, no prior history. He had a Floyd card. Is there anything that would suggest that had he applied, he would not have been given a concealed carry? No, Your Honor. He could have, like, prior to the events of this case, which, as noted, are not limited to merely possessing a firearm. There was a, you know, a shooting on a highway. But prior to the events of this case, he, like every other ordinary law-abiding citizen, could have applied for and would have received a CCL, at which point he could have lawfully carried a firearm in public. And that's exactly why that requirement is not an infringement on his right. He just chose not to avail himself of the lawful way of possessing a firearm in public in Illinois. Do we know anything from the record whether he had received any training, firearms training? I don't believe there's anything in the record to indicate one way or the other. And obviously, as I mentioned, that is one of the specific differences between the Concealed Carry Act and the Floyd Card Act. It's also something that the court explicitly said was constitutionally permissible as a component of a licensing case. The Seventh Circuit's opinion of Barron is actually pre-Bruin, but I think what all of the subsequent jurisprudence shows us is that the court there actually got this exactly right. If states are allowed to disarm groups of people like felons and the mentally ill that they determine are inherently dangerous, then a modern legislature has to be able to use a modern licensing regime to accomplish that goal. And that's, you know, one of the areas, Your Honor, for example, where I think the concurrences in Rahimi make that very clear. So I'm happy to answer any additional questions that the court might have, including about the open versus concealed carry issue. But if the court has no further questions, then we would ask that it affirm the judgment of the appellate court and defend its conviction and find that the relevant provision of the aggravated unlawful use of a weapon statute is constitutional. Thank you, Your Honor. Thank you very much. Counsel for the appellate in reply. Your Honor, there's a few points on rebuttal. Counsel, before you do that, I know I keep asking this question, but I still don't feel like I've gotten an answer. So does Illinois have a shall issue regime? That's what footnote nine of the U.S. Supreme Court stated, but we believe that it doesn't, because we really have to take a look into these different requirements that citizens have to undergo. And, again, I'll point Your Honors to the undefined orders section, where it requires that those who undergo the training follow the instructor's orders, but those orders are not defined. It seems like it's subject to the instructors and whether they're going to pass an individual who goes through a training scheme. That would be true of any state, right? If you get training, you won't get instructions from the instructor. True, and even if Your Honors find that it is truly a shall licensing regime, our issue with it is that it's still a double licensing regime. You first have to go through the FOIA Act and then go through the waiting period of that process, go through the licensing fees of that process, and then only after that, then you have to go through the CCL Act. And there's no historical analog. The test provided by Bruin shows that the state has to point you in the direction of a historical analog that is well-established, and it simply can't do that, and that's the test that the U.S. Supreme Court in Bruin has dawned upon us and that we have to follow. And there's simply no historical analog to show a double licensing regime. Let me ask the same question that I asked your opposing counsel. Did the Rahimi case impact the analysis that we should be using here? Yes, I think what Rahimi did, it also helps us. It's creating more law to help us compare and contrast the different statutes that are coming out. And with Rahimi, there there was a narrow statute that prohibited individuals who were subject to a domestic violence restraining order from possessing a firearm. And there the court found that Shuri statutes and going-armed laws were analogous, and that was because of the why and how behind those statutes. And they were meant to prohibit those who threatened others of their physical safety. And the court expressly stated that this nation has historically distinguished those individuals who have threatened the physical safety of another from those other law-abiding citizens, who Mr. Thompson was. Again, he possessed a FOIC card. In order to possess a FOIC card, you have to be a law-abiding citizen. And so this goes to another point that I want to bring up is that not having a CCL license is not synonymous with not being a law-abiding citizen because that's exactly what we have here. My client possessed a FOIC card because he was a law-abiding citizen. Now, the state attempts to redefine the Second Amendment through the legislature. It states that because you don't have a license and you're carrying a handgun for self-defense outside the home, that's not protected conduct. But the court in Bruin expressly stated that we cannot define the Second Amendment without applying history and tradition. And it relied on a United States Supreme Court case, the United States v. Stevens, where there the state was arguing that certain conduct was not protected under the First Amendment because a specific statute regulated that conduct. And the U.S. Supreme Court said that is not how we interpret the Constitution. We do it through history and tradition, not through the judgment of the legislature and its enactment of a statute. And that's precisely what we have here. This is what the state is proposing, that because he didn't have a license in accordance with the CCL Act, he was not a law-abiding citizen. I think we were told the difference between the FOID requirements and concealed carry is the requirement of training, that that's the significant difference between the two. Is that what you're objecting to, that there is this additional requirement to receive this license to have firearms training? Is that your objection? The objection is the double licensing regime, whether the training is there or not, the fact that you have to go through two separate waiting periods, through two separate processes. And notably, the FOID Act doesn't have a training requirement, yet citizens are allowed to purchase guns with a FOID card. And the difference between the FOID Act and CCL or a FOID card and CCL license is that with a FOID card you can possess and purchase a firearm, whereas CCL license you can carry your firearm in public for self-defense. And our argument is that you should be allowed to do that and still go through the CCL Act, the training, the fees, the waiting periods, without first having to go through the FOID Act. There's just no historical analog for that. And that's the test that we have before us. That's the test that we have to follow. And if we separate these two, which is an easy fix for the legislature, they can simply have citizens who want to possess their firearms at home and not carry them outside for public to go through the FOID Act process. And those who want to carry their firearm outside the home for self-defense can go through the CCL Act. They're still subject to the same background checks under the FOID Act and the CCL Act. The Illinois State Police is required to maintain databases, FOID card holders, and CCL licensees. The Illinois State Police is required to continuously monitor these different databases to ensure that there are no prohibitors. That would still be the same. We're not saying they shouldn't go through any background checks. We're saying they shouldn't have to go through two separate processes. Despite what Footnote 9 says. Footnote 9 specifically talks about the shell issue regimes, which often require applicants to undergo a background check or pass a firearms safety course. Specifically, that's what they're describing as shell issue states. And it would appear that they are saying that that's the Constitution. And I understand that not all footnotes are created equal, but, Your Honors, they were not addressing the Illinois CCL Act and the Bruin. And what they were simply doing was guarding against issuing advisory opinions. And, again, just to show how superficial this language was from the court, 23 of those states do not require citizens to first be issued a license before they can carry a handgun for self-defense in public. So the court was simply guarding against not issuing advisory opinions. And the state doesn't address the Seventh Circuit's decision in Atkinson, where Atkinson rejected its reliance on the Footnote 9 and stated, You can't rely on Footnote 9 to address gun laws. You have to go through the history and tradition that Bruin has dawned upon us in 2022. And that is what the appellate court failed to do below. It failed to go through a historical analysis. And if it had, it would have found that the state cannot point to a historical analysis of a double licensing regime. Are you aware of any other states that have what you're referring to as this double licensing regime? Not that I can find. I know the state cites to the Moore case, the Fourth Circuit. But there it was the background checks, right? It was the 77-R system with the HQL license. But it wasn't a double licensing regime like we have here. I think what would be synonymous to that would be having a FOIA card and still having to go through a background check system, which we do have under both acts, the CCL Act and the FOIA Act. And the court in Moore didn't conduct any historical analysis. And it's directly in conflict with the Seventh Circuit in Atkinson. And again, the state doesn't address that case, which tells us we cannot rely on Footnote 9. We have to go through the history and tradition test in order to determine whether a handgun, whether firearm regulations are constitutional. Now, the state also proposes that infringe means an all or nothing. Either it categorically bans someone from possessing a firearm, and that's the only way that it can infringe on someone's right to bear arms. But even your honors in Gun Saved Lives v. Ali, where there was a tax statute, found that that implicated the Second Amendment. I think it was a $25 tax on buying firearms. And even Breumann, Breumann came out the other way. There has to be a regulation that completely disallows you to possess a firearm in public. In Breumann, that statute did not completely ban people from possessing guns in public. It simply required them to show a heightened sense of self-defense, which was found unconstitutional. But it wasn't a complete ban on carrying firearms, and yet the court found that that was an infringement. In Rahimi, the court quickly went past the first step to the second step to find that the Second Amendment was implicated. And for all these reasons, your honors, we ask that you find that the AUPW subsections A1 and subsections 3A5 are facially unconstitutional, and that you reverse Mr. Thompson's conviction for aggravated unlawful possession of a weapon. Thank you. Thank you very much. Both sides. This case, Agenda Number 1, Number 129-965, People of the State of Illinois v. Tyson Thompson, will be taken under invitement. Thank you.